Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

John Roussas, SBN 227325
**CUTTER LAW P.C.**
401 Watt Ave.
Sacramento, CA 95864
Telephone: 916-290-9400
Facsimile: 916-588-9330
Email: jroussas@cutterlaw.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

**Pro hac vice* applications to be filed

*Attorneys for Plaintiffs and the Putative Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA BLUEMEL, HUDSON COCKROFT, WES KING, KATHY STEARNS, and JEFFREY KLEE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CONDUENT STATE & LOCAL SOLUTIONS, INC., DOES 1-10.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

# INTRODUCTION

1. This case seeks to hold Defendant Conduent State & Local Solutions, Inc. ("Conduent")—an out-of-state government contractor—responsible for forcing Californians to pay Ticketmaster-style Junk Fees to access state parks and other public lands.

2. In March 2016, Conduent was awarded a multi-year contract by the California Department of Parks and Recreation ("Cal Parks") to design and operate ReserveCalifornia.com and other related booking interfaces (collectively, "Reserve California").[1] Conduent operated Reserve California between August 2017 and August 2024.

3. Under the Contract, Conduent "agree[d] to indemnify, defend and save harmless the State . . . from any and all claims" from "any person . . . damaged by Contractor in the performance of this Agreement," thereby assuming the responsibility to comply with federal and state law and the consequences of noncompliance in designing, operating, and otherwise performing any services related to Reserve California. *See* Ex. A at 1017; Ex. B at 2.[2]

4. Despite this, Conduent did not comply with California law when designing and operating Reserve California.

5. Specifically, Reserve California's booking interface failed to include all mandatory reservation processing fees in the initial price displayed to consumers and failed to add the mandatory reservation processing fees until the final check-out screens.

6. Last minute, mandatory fees like those charged by Conduent are called "Junk Fees" by the Federal Trade Commission ("FTC"),[3] and this type of Junk Fee pricing strategy is commonly called "drip pricing" or "bait and switch" advertising.

---

[1] A copy of the contract received through a Public Records Act request is attached as **Exhibit A.** (the "Contract"). All page number citations to the Contract refer to the page number when viewing **Exhibit A** as a PDF, and the same is true with respect to the other attached exhibits.

[2] Attached as **Exhibit B** is a copy of the General Terms and Conditions that Plaintiffs understand to be applicable at the time Conduent was awarded the Contract in March 2016 and which were incorporated into the Contract by reference to the Contract, *see* Ex. A at 1017.

[3] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at*

7. Junk Fees, drip pricing, and bait and switch advertising are all illegal in California.

8. On October 7, 2023, California enacted law S.B. 478 (the "Honest Pricing Act"), which expressly banned Junk Fees by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A). The Honest Pricing Act became effective on July 1, 2024.

9. The Honest Pricing Act further confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by *existing* statutes, including the Unfair Competition Law . . . and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

10. As former President Joe Biden explained before he left office, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills."[4]

11. In fact, the Contract estimated that Conduent would make over ***$66 million*** across the life of the Contract in reservation processing fees—i.e., Junk Fees—charged to customers. Ex. A at 1004.

12. The deceptive nature of the Reserve California booking interface did not end with the last-minute addition of the Junk Fees.

13. Instead, the entire Reserve California user interface designed by Conduent led consumers to believe that the Junk Fees were being paid to Cal Parks, when in reality, the Junk Fees were kept by Conduent.

14. There was not a single reference to Conduent or any entity other than Cal Parks throughout the entire reservation booking process when Conduent operated the website.

---

https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[4] The White House, *President Biden's State of the Union Address*, The White House (Feb. 7, 2023), https://web.archive.org/web/20250106155151/https://www.whitehouse.gov/state-of-the-union-2023/ (last visited December 22, 2025).

15. Plaintiff Lisa Bluemel's experience is instructive. Ms. Bluemel made a same-day reservation through Reserve California in June 2024 for a campsite at Morro Bay State Park Campground. The original price displayed to Ms. Bluemel was $35.00. However, at checkout, in addition to the use fee of $35.00 for the campsite,[5] she was charged a $7.99 reservation Junk Fee that (unknown to Ms. Bluemel at the time) was paid to and kept by Conduent.

16. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 22.8% of the total sales price.

17. The initially quoted price of $35.00 was material to Ms. Bluemel's decision to proceed with the transaction online.

18. Had Ms. Bluemel known the true nature of the online Junk Fee, and that it was paid to Conduent, and not Cal Parks, Ms. Bluemel would not have made the reservation through Reserve California and instead would have attempted to pay directly in person to Cal Parks at Morro Bay State Park.

19. The other plaintiffs in this action—along with hundreds of thousands, if not millions, of other Reserve California customers—have had materially identical experiences.

20. This action seeks a return of the unlawfully charged fees from Conduent to Californians and other impacted consumers.

21. To be clear, Plaintiffs[6] do not seek any fee revenue retained by Cal Parks. Plaintiffs also do not seek any other remedies from Cal Parks. Only the Junk Fees kept by Conduent and Conduent' actions when it operated Reserve California are at issue in this lawsuit.

## **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

22. The District Court of the Northern District of California has personal jurisdiction over the parties in this matter because Plaintiff Wes King resides in Santa Clara County and the other Plaintiffs consent to the personal jurisdiction of this Court for purposes of this action. Within

[5] On information and belief, use fees for campgrounds are eventually paid to and kept by Cal Parks to help maintain the campgrounds. Use fees, and any other revenue ultimately retained by Cal Parks, are not at issue in this lawsuit. Only Junk Fees retained by Conduent are at issue.

[6] "Plaintiffs" refers collectively to Lisa Bluemel, Hudson Cockroft, Wes King, Kathy Stearns, and Jeffrey Klee.

this District, Conduent regularly conducted business from which this litigation directly arises—including the charging of the unlawful Junk Fees that are at issue in this litigation.

23. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

24. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Mr. King resides in Santa Clara County and Conduent's unlawful actions, which are the subject of this action, occurred in Santa Clara County, among other locations within California.

25. **Divisional Assignment:** Pursuant to Local Rules 3.2(c) and 3.5(b), Plaintiffs further state that assignment to the San Jose Division of this Court is proper because Mr. King resides in Santa Clara County and certain of the events at issue in this lawsuit occurred in Santa Clara County, which pursuant to Local Rule 3-2(e) provides for assignment to this Division. However, pursuant to Local Rule 3-12, Plaintiffs intend to relate this action to another action currently pending in the Oakland Division of this Court, *Chowning v. Tyler Technologies, Inc.*, Case No. 25-cv-4009-YGR—because this action and *Chowning* both concern substantially the same property, Reserve California, and transactions, the charging of reservation Junk Fees, and because an unduly burdensome duplication of labor and conflicting results will likely occur if these cases are conducted before different judges.

26. Pursuant to California Civil Code Section 1780(d), a declaration from Mr. King is attached as **Exhibit C**, confirming that venue is proper.

## THE PARTIES

### A. Plaintiffs

27. At all times relevant to this action, Plaintiff Lisa Bluemel was over the age of 18 and was a resident of Garden Grove, California.

28. At all times relevant to this action, Plaintiff Hudson Cockroft was over the age of 18 and was a resident of Long Beach, California.

29. At all times relevant to this action, Plaintiff Wes King was over the age of 18 and was a resident of Morgan Hill, California.

30. At all times relevant to this action, Plaintiff Kathy Stearns was over the age of 18 and was a resident of Tulare, California.

31. At all times relevant to this action, Plaintiff Jeffrey Klee was over the age of 18 and was a resident of Fresno, California.

**B. Defendants**

32. Defendant Conduent State & Local Solutions, Inc. (formerly Xerox State & Local Solutions, Inc.) is a New York Corporation with its headquarters in Florham Park, New Jersey. Conduent regularly conducted business within the State and this District, including by running Reserve California and charging the Junk Fees that are the subject of this litigation.

33. On information and belief, Does 1-10 are individuals and/or entities who facilitated Conduent's unlawful Junk Fee practices described in this Complaint. The identities of Does 1-10 are not presently known to Plaintiffs. The Doe defendants, along with defendant Conduent, are collectively referred to in this Complaint as "Defendants."

34. Plaintiffs expressly reserve their right to amend this complaint to add the Doe defendants by name, once their identities are known.

## FACTUAL ALLEGATIONS

**A. Companies Use Junk Fees to Trick Customers into Paying More than They Otherwise Would for Goods and Services.**

35. Large, sophisticated companies—like Conduent—with large, sophisticated marketing departments know that Junk Fees ensure consumers pay more for a good or service than they otherwise would or should pay.

36. Indeed, the White House estimates that Junk Fees cost consumers over $90 billion each year in the United States.[7]

[7] The White House, *Readout of White House State Legislators Convening on Junk Fees*, The White House (April 24, 2024), https://web.archive.org/web/20250116070341/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (last visited Dec. 22, 2025).

37. One of the most common Junk Fee pricing techniques is called "drip pricing," where a company does not disclose the total price of a product or service until late in the purchase process or incrementally discloses fees to the consumer throughout the transaction, after consumers have already expended time and effort and committed to the originally disclosed price.

38. Once a consumer decides what to buy, he is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming his search.[8]

39. In other words, omitting Junk Fees from the advertised price induces consumers to pay a higher total price than they otherwise would have.

40. Indeed, as the companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised disclosed "base price," and not based on the dripped price, especially when Junk Fees are not adequately disclosed.[9]

41. Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[10]

42. In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[11]

43. As the FTC's Bureau of Economics has explained, the use of Junk Fees and drip pricing adds steps to the process of determining the actual price of a good or service, which forces

---

[8] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[9] Alexander Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price.") (last visited Dec. 22, 2025).

[10] *Id.*

[11] Shelle Santa, Steven K. Dallas, and Vicki G. Morwitz, *Consumer Reactions to Drip Pricing*, Marketing Science (Jan. 15, 2020), at 189-90, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3924320 (last visited Dec. 22, 2025).

consumers to pay more than they would if presented with fully disclosed prices, including all applicable fees.[12]

44. As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[13]

45. The FTC has thus characterized Junk Fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine whether or not the cost is favorable compared to those prices listed by competitors.[14]

46. Moreover, drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce"). And the FTC's guidance on bait and switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). If the first contact is secured by the deceptive bait advertisement, it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

---

[12] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 8, at 2-3.

[13] *Id.* at 4; *see also* David Friedman, *Regulating Drip Pricing*, 31 Stanford Law & Policy Review 51 (February 18, 2019), at 67, https://ssrn.com/abstract=3337073 (last visited Dec. 22, 2025) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu *et al.*, *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[14] *See, e.g.*, Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

47. Given this, it is no surprise that companies are motivated to hide Junk Fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees brings in substantial revenue.

48. In many instances, companies even compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying product or service itself.[15] As a result, the product or service appears cheaper to consumers than competitor's products or services, even though the total cost of the product or service, inclusive of Junk Fees, is equally if not more expensive than those other companies' products or services.[16]

49. Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[17] In particular, companies are free to charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition.[18]

50. Hence, through drip pricing, companies can charge excessive Junk Fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a Junk Fee and its effect on the total price.

51. Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip pricing will lure consumers away from honest competitors that do not engage in such practices (and thus appear to charge higher prices) and the dishonest companies will earn a larger share and make higher profits than those competitors.[19]

52. Junk Fees charged through drip and/or partitioned pricing also generate significant burdens for individual consumers.[20]

---

[15] *Id.*

[16] *See id.*

[17] Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, *supra* note 9.

[18] *Id.* ("[F]irms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing.").

[19] *Id.* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[20] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) (explaining that "[c]onsumers faced with such fees pay upward of twenty percent more than when the actual price was disclosed upfront," and, as a result, such fees "impose substantial economic harms on consumers").

53. Put simply, Junk Fees and drip pricing are bad for consumers, are bad for businesses, and are bad for competition.

**B. California's Junk Fee Ban.**

54. Given the widespread use of Junk Fees, drip pricing, and bait and switch tactics in the online travel industry, in 2023, California took decisive action to protect its citizens.

55. On October 7, 2023, California enacted the Honest Pricing Act, which expressly banned Junk Fees in California by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

56. The Honest Pricing Act further confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by *existing* statutes, including the Unfair Competition Law . . . and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

57. The key provisions of the Honest Pricing Act were added to California's Consumer Legal Remedies Act Cal. Civ. Code §§ 1750 *et seq.*, ("CLRA") at Section 1770(a)(29)(A). The CLRA provides robust enforcement tools for consumers, including:

a. Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b. Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c. Establishing a substantive right to litigate in the forum where the transaction occurred. *Id.* § 1780(d).

d. Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

e. Authorizing injunctive relief. *Id.* § 1780(a)(2)

f. Authorizing actual damages. *Id.* § 1780(a)(1).

g. Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h. Authorizing punitive damages. *Id.* § 1780(a)(4).

i. Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j. Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k. Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

58. To help guide businesses into compliance with the law, on May 8, 2024, the California Office of the Attorney General issued a robust set of "Frequently Asked Questions" about what the Honest Pricing Act requires of businesses.[21]

/ / /

/ / /

/ / /

[21] https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last visited Dec. 22, 2025).

59. Among other guidance, the Attorney General's FAQs answer the following core questions:

Put simply, ***the price a Californian sees should be the price they pay.***

In order to help businesses comply with this new law, and to offer consumers guidance about what they can expect, the Attorney General's Office is releasing a set of FAQs. The law is found at Section 1770(a)(29) of the California Civil Code.

**What is the purpose of this law?**

The law is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." Advertising or listing a price that is less than what a consumer will eventually be charged is a form of deceptive advertising that also violates existing state and federal law. Truthful price advertising and listing helps businesses compete fairly on price and allows consumers to make accurate price comparisons.

**What does the new law require?**

The law requires honest pricing. It prohibits businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than government-imposed taxes or fees or reasonable shipping costs. The text of the law can be found at section 1770(a)(29) of the California Civil Code.

**What can a business exclude from the advertised price under this law?**

The listed or advertised price does not need to include taxes and/or fees that the government imposes on the transaction, such as sales tax. In addition, the listed or advertised price does not need to include reasonable shipping costs for physical goods.

**Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction?**

No. The price listed to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by advertising a price that is less than what a consumer will actually have to pay, but disclosing that additional fees will be added?**

No. The price advertised to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by listing or advertising one price and separately stating that an additional percentage fee will apply?**

No. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by advertising the total price for a good or service and separately noting that the total price includes certain fees and charges?**

Yes. The price advertised to the consumer must be the full price that the consumer is required to pay. But the law does not limit a merchant's ability to include fees or charges in that total price, or to tell consumers that its prices include those fees or charges.

**Does this law prohibit a business from advertising one price and adding a variable service fee later in the transaction?**

Yes. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

60. The Honest Pricing Act became effective on July 1, 2024.

**C. Conduent' Decision to Ignore the California Junk Fee Ban.**

61. Despite widespread media attention regarding the Honest Pricing Act, Conduent did not create an updated user interface on Reserve California that complied with the Junk Fee ban when it operated the website in July 2024.

62. Despite California's Office of the Attorney General issuing public guidance on compliance in May 2024, Conduent still did not update its practices when it operated the website at that time.

63. Despite having had over nine months to prepare for and bring its practices into compliance after the law was enacted in October 2023 and then became effective in July 2024, Conduent still did not update its practices when it operated the website during that time.

64. Despite many other companies bringing their practices into compliance after the law was enacted and became effective, Conduent still did not update its practices when it operated the website during that time.

65. Despite drip pricing and bait and switch advertising already being illegal in California when Conduent designed and launched the website in August 2017 and operated the website until August 2024, Conduent did not bring its practices into compliance during the time it operated the website.

66. Despite Conduent "agree[ing] to indemnify, defend and save harmless the State . . . from any and all claims" from "any person . . . damaged by Contractor in the performance of this Agreement" and therefore contractually assuming the responsibility to comply with federal and state law in performing any services related to Reserve California, Conduent still did not bring its practices into compliance during the time it operated the website. *See* Ex. B at 2.

67. Instead, Conduent made a conscious decision to ignore California's Junk Fee ban and its responsibility to comply with the law under its Contract with Cal Parks.

68. Conduent's decision to violate California's consumer protection laws is not an isolated incident.

69. Conduent frequently violated other laws and contractual requirements related to Reserve California.

70. For example, the Contract required Conduent to make Reserve California compliant with state and federal accessibility requirements and accessible to consumers with disabilities. *See* Ex. A at 59 ("Website shall comply with State law requiring accessibility to internal and external Users with disabilities . . . ."); *see also id.* at 58 (requiring website design plan to show "compliance

with California Government Code section 11135, which adopted the Section 508 standards issued by the United States Access Board, and Web Content Accessibility Guidelines (WCAG) 2.0 developed by the World Wide Web Consortium (W3C)").

71. However, Conduent launched and operated Reserve California for years in violation of these legal and contractual accessibility requirements.

72. Many pages had no titles, no headings, had unlabeled or mislabeled controls or images, used non-compliant color schemes, or used visual-only challenges, violating both general legal requirements for accessibility and functional accessibility specifications required by the Contract, as alleged in *State v. Conduent Inc., Inc. See* No. RG18888208, 2019 WL 6048611 (Cal. Super. Nov. 05, 2019).

73. It was not until a blind consumer sued Conduent in 2020 for violating its legal and contractual obligations to make Reserve California compliant with accessibility requirements that Conduent brought its practices into compliance.[22]

**D. The Reserve California Contract.**

74. In March 2016, Conduent was awarded a multi-year contract by Cal Parks to design and operate Reserve California. A true and correct copy of the Contract received through a Public Records Act request is attached as **Exhibit A**.

75. Under the Contract, among other things, Conduent agreed to:

a. "[D]evelop, implement, transition services, operate, support, maintain, and update an integrated, modern, dynamic, managed, Department-wide Recreation and Reservations Sales Service (hereafter called the Service), consisting of two components: (1) the Recreation Sales (RS) service and (2) the Reservations Management (RM) service. These components shall be seamlessly integrated. Contractor's Service shall be inclusive of all software, hardware, and staff required to perform this Scope of Work (SOW)." **Ex. A** at 16.

[22] *See Accessibility and Whistleblower Lawsuits - Bashin v. Conduent settles*, Access*Ability (May 14, 2024), https://buttondown.com/access-ability/archive/accessibility-and-whistleblower-lawsuits-bashin-v-5552/ (last visited Dec. 22, 2025).

b. Design the website, including, the "[r]eservation process flow" and "[u]ser interface design." *Id.* at 58.

c. "[P]rovide the capability to accurately process sales transactions for a diverse DPR inventory" which "include[es] fees for a variety of park entrance, camping, tours, programs, rentals, and merchandise inventory." *Id.* at 21.

76. In performing these functions, Conduent agreed through an indemnification provision that it would be liable for any unlawful conduct under the Contract:

> Contractor agrees to indemnify, defend and save harmless the State . . . from any and all claims and losses accruing or resulting to any person, firm or corporation who may be injured or damaged by Contractor in the performance of this Agreement.

**Ex. B** at 2; *see also* **Ex. A** at 1017 (Contract incorporating terms and conditions, including indemnification provision, by reference).

77. In other words, Conduent assumed the responsibility to comply with federal and state law and the consequences of noncompliance, and its performance of the Contract did not relieve it of its obligation to comply with federal and state law.

78. In exchange, Cal Parks "agree[d] to compensate the Contractor [with] the eligible reservation-based transaction fees," allowing Conduent to keep the Junk Fees that Conduent charged consumers. Ex. A at 992.

79. Under the California Public Resources Code, the Junk Fees could only be imposed "as reimbursement for the cost of providing th[e] service[s]" under the Contract. Cal. Pub. Res. Code § 5010.1(b).

80. However, the Contract estimates that Conduent would make over ***$66 million*** across the life of the Contract in reservation processing fees—i.e., Junk Fees—charged to customers. *Id.* at 1004.

81. This amount is excessive, serving not as reimbursement for the actual cost of operating Reserve California, as the Public Resources Code requires, but as profit for Conduent.

82. Pursuant to the Contract, Conduent began operating Reserve California in August 2017, which included designing and implementing the user interfaces and the payment processing procedures that are at issue in the litigation.

83. The Reserve California webpage may have been branded as "Cal Parks" to the public, but the reality was that Reserve California was a money grab for Conduent.

**E. Conduent's Standardized Booking Interface.**

84. Reserve California, as designed and operated by Conduent, used a standardized booking interface.

85. Here is how the booking interface would have appeared from a desktop computer during the time that Conduent operated the website.[23]

86. First, the user would have begun on the Reserve California landing page, where she was directed to search for a location:




/ / /

/ / /

/ / /

[23] The following images illustrate the desktop version of the current transaction process on Reserve California. By Plaintiffs' best recollections and despite interface and price changes, including the reservation fee change from $7.99 to $8.25, since the time of Conduent's operation of Reserve California, the representations Plaintiffs saw at the time they made their respective reservations were substantively identical to those depicted in the current desktop version.

87. After the user entered a location, she was directed to choose among campgrounds, campsite types, dates, and other information, followed by the option to select a campground:







88. On the next page, the user received a list of available campsites on her preferred date, with associated pricing information. In this example, the per-night price displayed for each campsite is $35:




89. However, unknown to the user, there was actually no way to complete the transaction for the quoted $35 price.

90. Relying on the pricing information that was provided, the user would have then selected a campsite, where, once again, the price of $35 would have been re-stated:




/ / /

/ / /

/ / /

91. After pressing "book now," the user was taken to the first of several checkout pages. The first checkout page, titled "reservation details," requested additional information from the user. Regardless of how the information was filled out, the only pricing information displayed would have continued to reflect that the campsite was $35 per night:



92. After filling out the additional information and pressing "reserve unit," the user was taken to another checkout page. For the first time, the full price of the campsite was displayed, with a "reservation fee" that would have been added in the amount of $7.99, bringing the total price to $42.99, a price increase of 22.8%:




93. In an effort to prevent the consumer from further investigating the last-minute addition of the Junk Fee, the page included a countdown clock in the top right corner to create a false sense of urgency to complete the transaction.

/ / /

/ / /

/ / /

94. The next and final screen would have prompted the user to input her credit card and reflected the total price of $42.99. The Junk Fee breakdown was not provided, but once again, the countdown timer persisted, creating a false sense of urgency to finalize the transaction and not investigate the fee:




95. Throughout the transaction process, the Cal Parks name and logo were displayed on the user interface.

96. Throughout the booking process, there was never any disclosure that the reservation fee—i.e., the Junk Fee—would have been paid to Conduent, and not Cal Parks.

97. The booking process was materially identical when made on a mobile device, as reflected in Paragraphs 104 to 115 below.

**F. Plaintiffs' Experiences with Conduent.**

98. Plaintiffs are each citizens of California who have been subjected to Conduent's predatory Junk Fee practices.

**1. Lisa Bluemel.**

99. Plaintiff Lisa Bluemel made multiple, separate reservations through Reserve California in June 2024 for campsites in Henry Cowell Redwoods State Park Campground, Pismo State Beach Oceano Campground, and Morro Bay State Park Campground.

100. For each reservation, Ms. Bluemel was originally quoted a certain price but charged at checkout an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent. For example, Ms. Bluemel was originally quoted a price of $35.00 for a same-day reservation on June 26, 2024 at Morro Bay State Park Campground, and at checkout, she was charged an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent, as the transaction receipt indicates:

| Description | Unit Price | Qty | Amount |
|---|---|---|---|
| **Unit: Morro Bay SP - Lower Section (sites 1-85) - Campsite - 075**<br>**Stay: Wed 06/26/24 - Thu 06/27/24 (1 night)**<br>**Classification: Regular**<br>**Comments: Web Bookings** | | | |
| Reservation Fees | $7.99 | 1 | $7.99 |
| Campsite 06/26/24 2:00 PM - 06/27/24 12:00 PM (Per 1 Days-Weekday Rate) | $35.00 | 1 | $35.00 |
| Please confirm your booking dates before finalizing your reservation.: True | | | |

| | |
|---|---|
| Subtotal | $42.99 |
| Sales Tax | $0.00 |
| Shopping Cart Total | **$42.99** |

101. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 22.8% of the total sales price.

102. The initially quoted price of $35.00 was material to Ms. Bluemel's decision to proceed with the transaction online.

103. Had Ms. Bluemel known the true nature of the Junk Fee, and that it was paid to Conduent, and not Cal Parks, Ms. Bluemel would not have made the reservations through Reserve California and instead would have attempted to pay in person directly to Cal Parks at Morro Bay State Park. She would have done the same with respect to the other reservations she made through Reserve California.

104. Here is how the booking interface appeared to Ms. Bluemel.[24]

105. First, Ms. Bluemel started on the Reserve California landing page, where she was directed to search for her desired location:




106. Next, after searching for Morro Bay State Park, Ms. Bluemel was prompted to select a date and location:




[24] A mobile version of the current transaction process is included here for illustrative purposes. Ms. Bluemel's actual reservation was made on a desktop computer, where, by her best recollection and despite interface and price changes since the time she made her reservation, the representations she saw were substantively identical to those depicted in the current mobile version.

107. On the next page, Ms. Bluemel received a list of available sites on her preferred date, with associated pricing information, reflecting an initial price of $35.00:




108. Ms. Bluemel then selected a campsite, where, once again, the initial price of $35.00 was re-stated:



109. Relying on the quoted price of $35.00, she continued with the transaction.

110. After pressing "book now," Ms. Bluemel was taken to the first of several checkout pages:







111. The initial price of $35.00 continued to be listed, and Ms. Bluemel continued to rely on that price.

/ / /

/ / /

/ / /

112. After filling out additional information and pressing "reserve unit," Ms. Bluemel was taken to an additional checkout page. For the first time, the true price of the campsite—$42.99—was displayed:




113. By this time, Ms. Bluemel had already committed considerable time selecting a location, a campground, a campsite type, and provided other details related to her stay.

/ / /

/ / /

/ / /

114. The next and final screen prompted Ms. Bluemel to input her credit card information and reflected only the total price of $42.99 for the campsite, without providing the Junk Fee breakdown:




115. The Cal Parks name and logo were displayed throughout the transaction process, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Conduent.

**2. Hudson Cockroft.**

116. Plaintiff Hudson Cockroft made a reservation through Reserve California in December 2022 for a campsite in San Onofre State Beach San Mateo Campground.

/ / /

/ / /

/ / /

117. Mr. Cockroft was originally quoted a price of $45.00 but charged at checkout an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent, as his transaction receipt indicates:

Unit: San Onofre SB - San Mateo Camp
(sites 68-100) - Campsite - SM069
Stay: Thu 01/12/23 - Fri 01/13/23 (1 night)
Classification: Regular
Comments: Web Bookings

Description: Reservation Fees
Price: $7.99
Quantity: 1

Description: Campsite 01/12/23 2:00 PM -
01/13/23 12:00 PM (Per 1 Days- Weekday
Rate)
Price: $45.00
Quantity: 1

--------------------------------------------
-----

Sub Total: $52.99
Sales Tax: $0.00
Grand Total: $52.99

118. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 17.75% of the total sales price.

119. The initially quoted price of $45.00 per night was material to Mr. Cockroft's decision to proceed with the transaction online.

120. Had Mr. Cockroft known the true nature of the Junk Fee, and that it was paid to Conduent, and not Cal Parks, Mr. Cockroft would not have made the reservation through Reserve California and instead would have attempted to pay in person directly to Cal Parks at San Onofre State Beach.

121. Here is how the booking interface would have appeared to Mr. Cockroft from a desktop computer.[25]

[25] A desktop version of the current transaction process is included here for illustrative purposes. By Mr. Cockroft's best recollection and despite interface and price changes since the time he made his reservations, the representations Mr. Cockroft saw were substantively identical to those depicted in the current desktop version, with one exception as explained below.

122. First, Mr. Cockroft would have started on the Reserve California landing page, where he would have been directed to search for his desired location:




123. Next, Mr. Cockroft was prompted to select a date and location and make additional selections, followed by the option to select a campground:



124. On the next page, Mr. Cockroft received a list of available sites on his preferred date, with associated pricing information, reflecting a price of $45.00:




125. Mr. Cockroft then selected a campsite, and the initial price of $45.00 was re-stated:




126. Relying on the quoted price of $45.00, he continued with the transaction.

/ / /

/ / /

/ / /

127. After pressing "book now," Mr. Cockroft was taken to the first of several checkout pages, where the initial price of $45.00 continued to be listed:[26]




[26] The version of this page that Mr. Cockroft saw when he made his reservation in December 2022 looked substantively identical to the page depicted above in Paragraph 91, which does not disclose a reservation fee. During the preparation of this Complaint, the page was updated to disclose the

128. Mr. Cockroft continued to rely on the initial price of $45.00 while proceeding with the transaction.

129. After filling out additional information and pressing "reserve unit," Mr. Cockroft was taken to an additional checkout page. For the first time in the transaction, the $7.99 reservation fee was included, and the true price of the campsite, $52.99, was displayed:




130. By this time, Mr. Cockroft had already committed considerable time selecting a location, a campground, a campsite type, and provided other details related to his stay.

/ / /

/ / /

/ / /

---

reservation fee before the user presses "reserve unit." Plaintiffs include the updated page only to illustrate the transaction process that Mr. Cockroft went through to make his reservation at San Onofre State Beach San Mateo Campground.

131. The next and final screen prompted Mr. Cockroft to input his credit card information and while the full price of $52.99 was listed, the Junk Fee was not separately broken out:




132. The Cal Parks name and logo were displayed throughout the transaction process, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Conduent.

**3. Wes King.**

133. Plaintiff Wes King made reservations through Reserve California each year between August 2022 and January 2024 for campsites in Millerton Lake State Recreation Area Meadows Loop Campground.

/ / /

/ / /

/ / /

134. For each reservation, Mr. King was originally quoted a certain price but charged at checkout an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent. For example, in August 2022, Mr. King was originally quoted a price of $40.00 per night for separate three-night reservations, and at checkout for each reservation, he was charged an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent, as his transaction receipt indicates:

| Description | Unit Price | Qty | Amount |
|---|---|---|---|
| **Unit: Millerton Lake SRA - Meadows Loop (sites 92-148) - Hook Up (E/W/S) Campsite - 36FT Hook Up(E,W,S)Standard Campsite-135**<br>**Stay: Wed 09/07/22 - Sat 09/10/22 (3 nights)**<br>**Classification: Regular**<br>**Comments: Web Bookings** | | | |
| Reservation Fees | $7.99 | 1 | $7.99 |
| Hook Up (E/W/S) Campsite 09/07/22 2:00 PM - 09/10/22 12:00 PM (Per 1 Days- Weekday Rate) | $40.00 | 2 | $80.00 |
| Hook Up (E/W/S) Campsite 09/07/22 2:00 PM - 09/10/22 12:00 PM (Per 1 Days- Weekend Rate) | $40.00 | 1 | $40.00 |
| **Unit: Millerton Lake SRA - Meadows Loop (sites 92-148) - Hook Up (E/W/S) Campsite - 36FT Hook Up(E,W,S)Standard Campsite-134**<br>**Stay: Wed 09/07/22 - Sat 09/10/22 (3 nights)**<br>**Classification: Regular**<br>**Comments: Web Bookings** | | | |
| Reservation Fees | $7.99 | 1 | $7.99 |
| Hook Up (E/W/S) Campsite 09/07/22 2:00 PM - 09/10/22 12:00 PM (Per 1 Days- Weekday Rate) | $40.00 | 2 | $80.00 |
| Hook Up (E/W/S) Campsite 09/07/22 2:00 PM - 09/10/22 12:00 PM (Per 1 Days- Weekend Rate) | $40.00 | 1 | $40.00 |

| | |
|---|---|
| Subtotal | $255.98 |
| Sales Tax | $0.00 |
| Shopping Cart Total | **$255.98** |

135. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 6.66% of the total sales price for each reservation.

136. The initially quoted price of $40.00 per night was material to Mr. King's decision to proceed with this transaction online.

137. Had Mr. King known the true nature of the Junk Fee, and that it was paid to Conduent, and not Cal Parks, Mr. King would not have made the reservations through Reserve California and instead would have attempted to pay in person directly to Cal Parks at Millerton Lake State Recreation Area. He would have done the same with respect to the reservations he made at other times through Reserve California.

138. Mr. King made his reservations from a desktop computer and went through a desktop transaction process that is substantially the same as that illustrated above.

139. As shown above and using the two three-night reservations he made in August 2022 as an example, Mr. King first searched for his desired camping location on Reserve California's landing page before selecting a date and location.

140. On the next page, Mr. King received a list of available sites on his preferred dates, with associated pricing information, reflecting an initial price of $40.00 per night.

141. On the next page, Mr. King selected a campsite, and the initial price of $40.00 per night was re-stated. The quoted price of $40.00 per night was material to Mr. King's decision to continue with the transaction, and relying on this price, Mr. King proceeded to checkout, expecting to pay $120.00 total for the first three-night reservation.

142. Mr. King was then taken to the first of several checkout pages. The initial price of $40.00 per night continued to be listed, and Mr. King continued to rely on that price, still expecting to pay $120.00 for the first three-night reservation.

143. After already committing considerable time making selections and providing details related to his stay, when Mr. King pressed "reserve unit," he was taken to an additional checkout page, where for the first time in the transaction the $7.99 reservation fee was included and the true price of the campsite, $127.99, was displayed.

144. Proceeding to add the second three-night reservation to the transaction, Mr. King pressed "continue shopping," which led Mr. King back to the page where he selected the same date and location as for the first three-night reservation.

145. On the following page, Mr. King received a list of available sites on his preferred dates, with associated pricing information, again reflecting an initial price of $40.00 per night.

146. Next, Mr. King selected a campsite, and the initial price of $40.00 per night was re-stated. As before, the quoted price of $40.00 per night was material to Mr. King's decision to continue with the transaction, and relying on this price, Mr. King proceeded to checkout, expecting to pay $120.00 total for the second three-night reservation.

147. Again, on the first checkout page Mr. King saw, the initial price of $40.00 per night continued to be listed, and Mr. King continued to rely on that price, still expecting to pay $120.00 for the second three-night reservation.

148. Having already committed considerable time and providing details for the reservation, Mr. King pressed "reserve unit," and he was taken to an additional checkout page, where for the first time again the $7.99 reservation fee was included and the true price of the second campsite, $127.99, was displayed.

149. The final screen prompted Mr. King to input his credit card information and reflected only the total price of $255.98, without providing the Junk Fee breakdown.

150. Throughout the transaction process, the Cal Parks name and logo were displayed, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Conduent.

**4. Kathy Stearns.**

151. Plaintiff Kathy Stearns made reservations through Reserve California in June 2024 for a campsite in Oceano Dunes State Vehicular Recreation Area Campground and in July 2024 for a campsite in Pismo State Beach Campground Oceano Campground.

152. For each reservation, Ms. Stearns was originally quoted a certain price but charged at checkout an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent. For example, for the two-night reservation she made in June 2024, Ms. Stearns was originally quoted a price of $5.00 per night but charged at checkout an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent, as her transaction receipt indicates:

| Description | Unit Price | Qty | Amount |
|---|---|---|---|
| **Unit: Oceano Dunes SVRA - Oceano Dunes SVRA - Off Road Vehicle Campsite - Off-Highway Vehicle Site 926**<br>**Stay: Sun 06/23/24 - Tue 06/25/24 (2 nights)**<br>**Classification: Disabled Discount**<br>**Comments: Web Bookings** | | | |
| Reservation Fees | $7.99 | 1 | $7.99 |
| Off Road Vehicle Campsite 06/23/24 9:00 AM - 06/25/24 6:00 PM (Per 1 Days- Weekday Rate)<br>Please confirm your booking dates before finalizing your reservation.: True<br>By clicking this box, I am acknowledging I have read and understand the alert, "Important Arroyo Grande Creek and Oceano Dunes SVRA Access Information" posted at https://ohv.parks.ca.gov/?page_id=1207.: True | $5.00 | 2 | $10.00 |

| | |
|---|---|
| Subtotal | $17.99 |
| Sales Tax | $0.00 |
| Shopping Cart Total | **$17.99** |

153. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 79.9% of the total sales price.

154. The initially quoted price of $5.00 per night was material to Ms. Stearns' decision to proceed with the transaction online.

155. Had Ms. Stearns known the true nature of the Junk Fee, and that it was paid to Conduent, and not Cal Parks, Ms. Stearns would not have made the reservation through Reserve California and instead would have attempted to pay in person directly to Cal Parks at Oceano Dunes State Vehicular Recreation Area. She would have done the same with respect to the other reservation she made through Reserve California.

156. Ms. Stearns made her reservations from a desktop computer and went through a desktop transaction process that is substantially the same as that illustrated above.

157. As shown above and using her two-night reservation in June 2024 as an example, Ms. Stearns first searched for her desired camping location on Reserve California's landing page before selecting a date and location.

158. On the next page, Ms. Stearns received a list of available sites on her preferred dates, with associated pricing information, reflecting an initial price of $5.00 per night.

159. On the next page, Ms. Stearns selected a campsite, and the initial price of $5.00 per night was re-stated. Relying on the quoted price of $5.00 per night, she continued with the transaction, expecting to pay $10.00 total for the two-night reservation.

160. Ms. Stearns was then taken to the first of several checkout pages. The initial price of $5.00 per night continued to be listed, and Ms. Stearns continued to rely on that price, still expecting to pay $10.00 total for the two-night reservation.

161. After already committing considerable time making selections and providing details related to her stay, when Ms. Stearns pressed "reserve unit," she was taken to an additional checkout page, where for the first time in the transaction the $7.99 reservation fee was included and the true price of the campsite, $17.99, was displayed.

162. The final screen prompted Ms. Stearns to input her credit card information and reflected only the total price of $17.99, without providing the Junk Fee breakdown.

163. The Cal Parks name and logo were displayed throughout the transaction process, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Conduent.

**5. Jeffrey Klee.**

164. Plaintiff Jeffrey Klee made a seven-night reservation through Reserve California in December 2022 for a campsite in Hearst San Simeon Creek Campground.

165. Mr. Klee was originally quoted a price of $17.50 per night, but at checkout, he was charged an additional $7.99 reservation Junk Fee that was paid to and kept by Conduent, as his transaction receipt indicates:

| Description | Unit Price | Qty | Amount |
|---|---|---|---|
| **Unit: Hearst San Simeon SP - Creek Campground Upper Section (sites 1-35) - Campsite - C15**<br>**Stay: Sun 04/09/23 - Sun 04/16/23 (7 nights)**<br>**Classification: Disabled Discount**<br>**Comments: Web Bookings** | | | |
| Reservation Fees | $7.99 | 1 | $7.99 |
| Campsite 04/09/23 2:00 PM - 04/16/23 12:00 PM (Per 1 Days-Weekday Rate) | $17.50 | 5 | $87.50 |
| Campsite 04/09/23 2:00 PM - 04/16/23 12:00 PM (Per 1 Days-Weekend Rate) | $17.50 | 2 | $35.00 |

| | |
|---|---|
| Subtotal | $130.49 |
| Sales Tax | $0.00 |
| Shopping Cart Total | **$130.49** |

166. The last-minute addition of the $7.99 Junk Fee at checkout reflected a price increase of 6.52% of the total sales price.

167. The initially quoted price of $17.50 per night was material to Mr. Klee's decision to proceed with the transaction online.

168. Had Mr. Klee known the true nature of the Junk Fee, and that it was paid to Conduent, and not Cal Parks, Mr. Klee would not have made the reservation through Reserve California and instead would have attempted to pay in person directly to Cal Parks at Hearst San Simeon State Park.

169. Mr. Klee made his reservation from a desktop computer and went through a desktop transaction process that is substantially the same as that illustrated above.

170. As shown above and using the seven-night reservation he made in December 2022 as an example, Mr. Klee first searched for his desired camping location on Reserve California's landing page before selecting a date and location.

171. On the next page, Mr. Klee received a list of available sites on his preferred date, with associated pricing information, reflecting an initial price of $17.50 per night.

172. On the next page, Mr. Klee selected a campsite, and the initial price of 17.50 per night was re-stated. Relying on the quoted price of $17.50 per night, he continued with the transaction, expecting to pay $122.50 total for the seven-night reservation.

173. Mr. Klee was then taken to the first of several checkout pages. The initial price of $17.50 per night continued to be listed, and Mr. Klee continued to rely on that price, still expecting to pay $122.50 total for the seven-night reservation.

174. After already committing considerable time making selections and providing details related to his stay, when Mr. Klee pressed "reserve unit," he was taken to an additional checkout page, where for the first time in the transaction the $7.99 reservation fee was included and the true price of the campsite, $130.49, was displayed.

175. The final screen prompted Mr. Klee to input his credit card information and reflected only the total price of $130.49, without providing the Junk Fee breakdown.

176. The Cal Parks name and logo were displayed throughout the transaction process, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Conduent.

## CLASS ALLEGATIONS

177. This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

178. Plaintiffs seek certification of the following class (the "Class"):

> All persons who, within the four years preceding the filing of this action plus any tolled period,[27] were charged a reservation processing

[27] On June 19, 2025, the Parties entered into a Tolling Agreement. Under the Tolling Agreement

fee or other similar mandatory transaction fee by Conduent that exceeded the originally displayed price for a transaction made through Reserve California.

179. Conduent's deceptive Junk Fee practices violated each Class member's individual statutory right to truthful information from Conduent about the actual price of reservations made on Reserve California.

180. Conduent's deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of Conduent's illegal Junk Fee practices.

181. Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

182. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

183. **Numerosity.** Plaintiffs are informed and believe that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the class can be determined from information in the possession and control of Conduent.

184. **Commonality.** Conduent has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of

---

and its subsequent extensions, the Parties agreed to toll the running of any applicable statutes of limitations or other time-related bars, from June 19, 2025 to January 9, 2026, for claims based on Conduent's actions at issue in this lawsuit for Plaintiffs and absent putative class members. If necessary, Plaintiffs can file the Tolling Agreement and its subsequent extensions with the Court.

inconsistent judgments and/or obligations imposed on Conduent. Numerous common issues of fact and law exist, including, without limitation:

a. Whether Conduent is a "person" within the meaning of Section 1761(c).

b. Whether Plaintiffs are "consumers" within the meaning of Section 1761(d).

c. Whether Conduent's Junk Fee practices violated Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

d. Whether Conduent's Junk Fee practices violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

e. Whether Conduent's Junk Fee practices violated any other provisions of the CLRA.

f. Whether Conduent's Junk Fee practices violated the UCL and/or the FAL.

g. Whether Conduent made standardized representations to consumers.

h. Whether Conduent charged standardized Junk Fees to consumers.

i. The dates of Conduent's practices and any purported changes to those practices.

185. **Predominance.** These common issues predominate over individualized inquiries in this action because Conduent's liability can be established as to all members of the Class as discussed herein.

186. **Typicality.** Plaintiffs' claims against Conduent and experiences with Conduent are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiffs' claims arise from Conduent' practices that are applicable to the entire Class.

187. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money by paying Junk Fees to Conduent. Plaintiffs

also have no interests antagonistic to those of the Class, and Conduent has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

188. **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

189. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

### A. First Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, on Behalf of Plaintiffs and the Class.

190. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 189, inclusive, of this Complaint.

191. At all relevant times, Plaintiffs and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

192. Conduent's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of camping reservations and charging mandatory Junk Fees that exceeded the price initially advertised and/or displayed to consumers.

193. Conduent violated the CLRA by, among other things, making materially false statements and omitting truthful information about the Junk Fees charged to Plaintiffs and the Class.

194. Specifically, Conduent violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

195. Additionally, Conduent violated the CLRA by:

a. "Passing off goods or services as those of another" (a)(1);

b. "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

c. "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

d. "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

e. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14); and

f. "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20).

196. Conduent's actions and misrepresentations were material, and Conduent's violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to incur the Junk Fee charges.

197. As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

198. Conduent's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class for Defendants' own benefit to the detriment of Plaintiffs and the Class.

199. On May 12, 2025, Plaintiffs sent Conduent a CLRA pre-suit notice pursuant to Section 1782 of the CLRA.[28] Conduent confirmed receipt of the letter, and the parties entered into a tolling agreement to facilitate pre-filing compliance discussions. To date, Conduent has refused to provide the relief requested to Plaintiffs and absent putative class members.

200. Accordingly, Plaintiffs seek all available remedies under the CLRA, including, without limitation, actual damages, punitive damages, statutory damages, restitution, injunctive and declaratory relief, and attorney's fees and costs.

**B. Second Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, on Behalf of Plaintiffs and the Class.**

201. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 189, inclusive, of this Complaint.

202. Conduent, Plaintiffs, and Class members are "persons" within the meaning of the UCL.

203. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

204. Conduent's practices of charging Junk Fees were "unlawful" within the meaning of the UCL because, among other things, those Junk Fees violate the CLRA, with Section 1770(a)(9) prohibiting "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)29(A) prohibiting "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

[28] A copy of the CLRA pre-suit notice is attached as **Exhibit D**.

205. The Junk Fees were also unlawful within the meaning of the UCL because they violated the False Advertising Act (as detailed in the Third Cause of Action, below) and also violated the FTC Act, as alleged above.

206. The acts and practices of Conduent as alleged herein also constituted “unfair” business acts and practices under the UCL because Conduent’s conduct was unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Conduent’s conduct outweighed any conceivable benefit of such conduct.

207. Conduent has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into paying Junk Fees by failing to display those prices in the initially advertised prices.

208. Conduent has, in the course of business and in the course of trade or commerce, charged these unlawful Junk Fees to Plaintiffs and the Class.

209. Plaintiffs and the Class have suffered injury in fact—in the form of Junk Fees—and have lost money as a result of Conduent’s unlawful business acts and practices.

210. Plaintiffs and the Class seek an order providing restitution and disgorgement of all Junk Fees paid to Conduent.

211. Plaintiffs and the Class further seek their attorneys’ fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce “an important right affecting the public interest” in bringing this cause of action.

**C. Third Cause of Action: Violation of California’s False Advertising Law, Cal. Civ. Code §§ 17500 *et seq.*, on Behalf of Plaintiffs and the Class.**

212. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 189, inclusive, of this Complaint.

213. In violation of California’s False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* Conduent’s advertisements, policies, acts, and practices described in this Complaint were designed to cause Plaintiffs and the Class to pay Junk Fees to Conduent, and did in fact result in Plaintiffs and the Class paying unlawful Junk Fees to Conduent.

214. Conduent knew or reasonably should have known that representations on Reserve California were false and deceptive.

215. Specifically, as alleged in this Complaint, Conduent's unfair, unconscionable, deceptive acts, practices, omissions, and/or affirmative misstatements include, but are not limited to displaying and advertising an initial price for which a consumer could not actually complete the transaction.

216. As a result, Plaintiffs and the Class are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Conduent was unjustly enriched.

217. Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**PRAYER FOR RELIEF**

218. WHEREFORE, Plaintiffs and members of the Class seek an Order:

a. Certifying the proposed Class pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. Declaring that Conduent is financially responsible for notifying the Class members of the pendency of this suit;

c. Declaring that Conduent has committed the violations of law alleged herein;

d. Awarding statutory damages in the maximum amount for which the law provides;

e. Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

f. Providing for any and all equitable monetary relief, including, without limitation, restitution, the Court deems appropriate;

g. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

h. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorney's fees;

i. Awarding pre- and post-judgment interest to extent the law allows; and

j. Providing such further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: December 23, 2025

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

John Roussas, SBN 227325
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
Facsimile: 916-588-9330
Email: jroussas@cutterlaw.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

**Pro hac vice* applications to be filed

*Attorneys for Plaintiffs and the Putative Class*

**DEMAND FOR TRIAL BY JURY**

Plaintiffs, on behalf of themselves and the putative class, hereby respectfully demand a trial by jury on all claims for which a jury trial is available.

Dated: December 23, 2025

/s/ Wesley M. Griffith
Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

John Roussas, SBN 227325
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
Facsimile: 916-588-9330
Email: jroussas@cutterlaw.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

**Pro hac vice* applications to be filed

*Attorneys for Plaintiffs and the Putative Class*